IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CAPITAL FUNDING GROUP, INC.,

    Plaintiff,

    v.                                                Civil Action No. RDB-20-1353

ALAN J. ZUCCARI, *et al.*,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

This is the latest in a series of lawsuits arising from a collapsed nursing home business enterprise conducted by John Dwyer ("Dwyer") and Defendant Alan J. Zuccari ("Zuccari"). *See Dwyer v. Zuccari*, CL-2017-1827 (Va. Cir. Ct.); *Dwyer, et al. v. Zuccari*, RDB-19-1272 (D. Md.); *Arkansas Nursing Home Acquisition, LLC, et al. v. CFG Community Bank, et al.*, RDB-19-3632 (D. Md.). The lawsuits began in 2017, when Dwyer sued Zuccari in the Circuit Court of Fairfax County, Virginia, seeking to recoup expenses associated with the settlement of professional liability claims. *Dwyer v. Zuccari*, CL-2017-1827. Dwyer voluntarily dismissed the action after presenting his evidence in a jury trial, but before the jury issued a verdict or judgment was entered. Subsequently, Dwyer, Zuccari, and their entities elected to file suit against one another in this Court.

In April 2019, Dwyer and Plaintiff Capital Funding Group, Inc., ("Plaintiff" or "CFG"), a Dwyer entity which is also the Plaintiff in this action, brought suit against Zuccari in this Court, alleging that Zuccari had not satisfied his obligations under a purported oral partnership agreement. *Dwyer, et al. v. Zuccari*, RDB-19-1272 (D. Md.) Ultimately, this Court

1

rejected the theory that Dwyer and Zuccari's alleged business dealings constituted a partnership, dismissed Dwyer's claims, and permitted CFG to pursue only a single unjust enrichment claim against Zuccari.  *See Dwyer v. Zuccari*, RDB-19-1272, 2020 WL 1308282 (D. Md. Mar. 19, 2020).  Next, on December 24, 2019, two Zuccari entities sued Dwyer and others for engaging in three alleged "schemes" related to the failed nursing home venture.  *Arkansas Nursing Home Acquisition, LLC, et al. v. CFG Community Bank, et al.*, RDB-19-3632 (D. Md.).  In that case, this Court reduced the seventeen-count Complaint to just three counts.  *Arkansas Nursing Home Acquisition, LLC v. CFG Cmty. Bank*, --- F. Supp. 3d ---, RDB-19-3632, 2020 WL 2542165 (D. Md. May 19, 2020).

In this action, filed on June 1, 2020, CFG seeks to enforce a purported oral indemnification[1] agreement against Zuccari and his investment vehicle, AJZ Capital (the "Defendants").  The six-count Complaint alleges breach of contract, various other state law claims, and seeks a Declaratory Judgment.  Jurisdiction is premised on diversity of citizenship pursuant to 28 U.S.C. § 1332(a).  Presently pending is Defendants Zuccari and AJZ Capital's Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint.  (ECF No. 10.)  CFG opposes the motion.  (ECF No. 17.)  The parties' submissions have been reviewed and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons that follow, the Motion to Dismiss (ECF No. 10) is GRANTED and this case is DISMISSED WITH PREJUDICE.

---

[1] A common theme running among these cases is the lack of a written agreement.  In Dwyer's first lawsuit against Zuccari, in Virginia, Dwyer alleged that he and Zuccari had entered into a partnership formed by oral agreement.  Compl. ¶ 62, *Dwyer v. Zuccari*, CL-2017-1827 (Va. Cir. Ct.) ("The contract creating the Partnership Venture was oral and/ or formed by course of conduct between the parties arising out of acts in Maryland.").  The same allegations were made in his subsequent suit in this Court.  Am. Compl. ¶ 72, *Dwyer, et al. v. Zuccari*, RDB-19-1272 (D. Md.) ("The partnership formed by Dwyer and Zuccari to carry on a business regarding nursing homes was either oral or implied.").

**BACKGROUND**

In ruling on a motion to dismiss, this Court accepts as true the facts alleged in the plaintiff's complaint.  *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).  Documents which are "integral to the complaint and authentic" may also be considered.  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) (quoting *Sec'y of State for Defense v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).  In this case, Plaintiff CFG seeks to enforce an alleged oral indemnification agreement against Defendants Zuccari and AJZ Capital following the sale of nursing home assets to Joseph Schwartz ("Schwartz") and Skyline Healthcare ("Skyline").  (ECF No. 1 ¶¶ 1-2.)

Plaintiff CFG, a Maryland corporation, is wholly owned by Dwyer, who is the chairman of the corporation.  (ECF No. 1 ¶ 6.)  Defendant Zuccari, a resident of Virginia, is the President, CEO, and founder of Hamilton Insurance Agency.  (*Id.* ¶ 7.)  Defendant AJZ Capital is a Virginia limited liability company with its principal place of business in Virginia.  (*Id.* ¶ 8.)  Zuccari is the managing member of AJZ Capital and owns a 99% interest in the company, with the remainder owned by his wife.  (*Id.*)

I. **The Sale of Nursing Home Assets to Schwartz and Skyline.**

In 2012, Dwyer and Zuccari "through respective entities," purchased nursing homes in Florida, Arkansas, Ohio, Oklahoma, and Texas.  (*Id.* ¶¶ 13, 14.)  A Zuccari entity named Sevarus provided risk management services to the entities, and Zuccari's insurance agency, Alan J. Zuccari, Inc. (trading as Hamilton Insurance Agency), brokered insurance for them.  (*Id.* ¶ 16.)

In 2015, Dwyer and Zuccari decided to sell entities in Arkansas and Florida.  (*Id.* ¶ 18.)

Zuccari allegedly proposed to Dwyer the sale of four Florida nursing homes to Joseph Schwartz, whom he described as a friend and business colleague. (*Id.* ¶ 19.) Zuccari allegedly chose Schwartz because Schwartz and his business, Skyline Healthcare ("Skyline"), would continue to use Hamilton's insurance brokerage services and Sevarus for risk management. (*Id.* ¶ 20.) On November 1, 2015, the closing occurred on the four nursing homes in Florida in an all-cash transaction. (*Id.* ¶ 21.)

"In the same time frame," Dwyer, Zuccari, and Schwartz arranged the financed purchase of nursing home assets in Arkansas owned by Arkansas SNF Operations Acquisition I, LLC ("Arkansas I"), Arkansas SNF Operations Acquisition II, LLC ("Arkansas II"), Arkansas SNF Operations Acquisition III, LLC ("Arkansas III"), and Arkansas Real Estate Investors, LLC ("AREI"). (*Id.* ¶ 22.) It is alleged that each of these entities was "indirectly" owned 51% by Dwyer and 49% by Zuccari, and that AJZ Capital was Zuccari's investment vehicle for AREI. (*Id.*) Ultimately, Schwarz and Skyline purchased assets owned by Arkansas II, Arkansas III, and AREI. (*Id.* ¶¶ 1, 22.) On December 1, 2015, Schwartz paid part of the purchase price for the operating companies in cash, and gave a promissory note to Arkansas III for the balance. (*Id.* ¶ 24.)

To complete the purchase, Dwyer arranged third-party financing for Schwartz's purchase, to be provided by Fortress Investment Group, LLC. (*Id.* ¶¶ 24-25.) In November 2015, Fortress Investment Group, LLC provided a term sheet for a loan to Skyline Arkansas Holdings, LLC ("Skyline Arkansas") to be funded by Fortress Credit Co. LLC as agent ("Fortress"). (*Id.* ¶ 28.) The term sheet provided for a $14 million term loan to fund Skyline Arkansas' acquisition of Skyline CHP Holdings, LLC and Creekside Holdings, LLC (the

4

"Skyline Borrowers"). (*Id.* ¶ 28.) The credit facility was required to be guaranteed by CFG, Dwyer, and his wife, as well as Schwartz, his wife, and Skyline Holdings, LLC. (*Id.*)

## II. The Guaranty Contribution Agreement and Closing.

On December 16, 2015, Zuccari allegedly confirmed with Dwyer and CFG's Chief Financial Officer, Kevin Kirby, that Zuccari would personally indemnify and contribute to Dwyer and CFG 49% of any losses incurred or payments made by CFG, Dwyer, or their affiliated entities or personnel for payment on the Fortress loan should Schwartz or Skyline default. (*Id.* ¶ 34.) The parties proceeded to exchange written communications concerning the agreement. Consistent with the business dealings between Dwyer and Zuccari, this alleged agreement was never reduced to a signed writing, and the parties eventually modified its terms.

On December 17, 2015, Zuccari allegedly emailed Dwyer "to confirm his promise . . . to provide for a 'claw back' of funds from Zuccari in the event of a default by Schwartz." (*Id.* ¶ 35.) On February 2, 2016 Zuccari was provided a draft Guaranty Contribution Agreement between and among CFG, Dwyer, and Zuccari to memorialize their agreement. (*Id.* ¶ 36.) The draft agreement provided that Zuccari would defend CFG and Dwyer, as well as their affiliates, and "pay, reimburse, and . . . advance to each of them for, any and all Losses incurred or sustained by, or imposed upon" them. (*Id.*) The Guaranty Contribution Agreement further indicated that Zuccari would be responsible for 49% of the losses. (*Id.* ¶ 37.)

Upon receipt of the draft Guaranty Contribution Agreement, Zuccari "did not deny" that he had agreed to indemnity Dwyer and CFG. (*Id.* ¶ 38.) The February 2, 2016 draft was sent by the Chief Financial Officer ("CFO") of CFG to David Art, the CFO of Hamilton Insurance. (*Id.* ¶ 39.) The two agents engaged in correspondence about a proposed

5

modification to the oral agreement. (*Id.* ¶ 40.) The parties' proposals "morphed into an arrangement where AJZ Capital would be added as an indemnitor so long as Zuccari agreed with CFG and Dwyer that he would remain personally liable for the amount of the losses if AJZ Capital did not have equity value and liquidity of at least $5 million." (*Id.*) On February 22, 2016, CFG's CEO emailed Art, asking "if you trip the covenant, what is the cure?" (*Id.* ¶ 41.) Art responded that "if we trip the minimum liquidity requirement, then Alan should be obligated to infuse capital to meet the minimum liquidity." (*Id.*) As a result of these negotiations, "[o]n February 22, 2016, an agreement was reached between CFG, Dwyer, Zuccari, and AJZ Capital, whereby AJZ Capital would indemnify CFG and Dwyer for losses sustained as a result of a default by Schwartz and Skyline, and Zuccari personally agreed to fund those losses if AJZ Capital had less than $5 million of equity and liquidity." (*Id.* ¶ 43.)

The Fortress loan closed on the following day, February 23, 2016. (*Id.* ¶ 42.) The loan funds were obtained by a special purpose entity, CLMG Skyline SPE I, LLC ("CLMG Skyline"), from Fortress Credit Co. LLC. (*Id.* ¶ 45.) The final loan terms provided that CLMG Skyline was entitled to $14 million and that CFG, Dwyer, his wife would guaranty CLMG Skyline's repayment obligations. (*Id.*) CLMG Skyline in turn "made a loan of the Fortress loan proceeds of $14 million to Schwartz's Skyline Arkansas entities (the "Skyline Note")." (*Id.* ¶ 46.) Schwartz, his wife, and two Skyline-related entities guaranteed the repayment of the note. (*Id.* ¶ 46.)

### III.  Schwartz and Skyline Default.

Through these transactions and others, Schwartz and Skyline took over the operations of more than 100 nursing homes in eleven states, overseeing the care of more than 7,000

6

residents. (*Id.* ¶ 53.) It quickly became apparent that Schwartz and Skyline were not capable of managing the large number of nursing homes they had acquired. (*Id.* ¶ 52.) It is alleged that Schwartz "had no experience operating . . . nursing homes . . . and ran his Skyline business from a small office above a pizza parlor in New Jersey." (*Id.*) Eventually, the entities failed to make payroll at 36 nursing homes, and certain nursing homes were shuttered due to neglect. (*Id.* ¶ 54.) Government officials assumed operational control at numerous Skyline buildings and placed them into receivership. (*Id.*) Schwartz and Skyline are alleged to have stolen over $2 million from employees' paychecks. (*Id.* ¶ 55.) It is believed that Schwartz has absconded from the United States to evade claims of civil and criminal liability. (*Id.* ¶ 1.)

The Skyline Borrowers defaulted under the Fortress loan in October 2016. (*Id.* ¶ 56.) On May 5, 2017, Fortress sent a Notice of Default to CLMG Skyline and the guarantors of the Fortress loan. (*Id.* ¶ 57.) Another Notice of Default was sent on October 30, 2017. (*Id.* ¶ 58.) In October 2017, the Skyline Borrowers stopped paying under the Skyline Note. (*Id.* ¶ 59.) In October 2018, CFG began making payments for the purchase of CLMG Skyline's compliance with the Fortress loan. (*Id.* ¶ 63.) CFG Alleges that Zuccari and AJZ Capital have failed to contribute and indemnity CFG for those payments. (*Id.*) CFG further alleges that AJZ Capital did not satisfy its liquidity requirements. (*Id.* ¶ 67.) A loan balance of approximately $10,450,000.00 remains outstanding. (*Id.* ¶ 105.)

CFG commenced this action on June 1, 2020. (ECF No. 1.) The Complaint contains six Counts. Count I, a breach of contract claim, proceeds under two theories. First, Zuccari allegedly breached his agreement by failing to contribute 49% of the payments made and losses incurred by CFG in connection with . . . the Fortress loan. (*Id.* ¶ 67.) Second, Zuccari is

7

alleged to have breached his agreement by failing to maintain $5 million in equity value and liquidity in AJZ Capital. (*Id.*) Count II brings a similar breach of contract claim against AJZ Capital. (*Id.* ¶¶ 74-75.) Count III sets forth a third-party beneficiary breach of contract action against Zuccari. Counts IV and V bring "detrimental reliance/promissory estoppel" claims against Zuccari and AJZ Capital, respectively. Finally, Count VI seeks a declaratory judgment that Zuccari and AJZ Capital owe a 49% share of the liabilities of CFG due under the Fortress loan. (*Id.* ¶ 105.) On June 29, 2020, Zuccari and AJZ Capital moved to dismiss CFG's Complaint under Fed. R. Civ. P. 12(b)(6). (ECF No. 10.) The motion is now ripe for adjudication.

## STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). While a complaint need not include "detailed factual allegations," it must set forth "enough factual matter [taken as true] to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff cannot rely on bald accusations or mere speculation. *Twombly*, 550 U.S. at 555.

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Hall v. DirectTV*, LLC, 846 F.3d 757, 765 (4th Cir. 2017). A court, however, is not required to accept legal conclusions drawn from those facts. *Iqbal*, 556 U.S. at 678. "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

While ruling on a motion to dismiss, a court's evaluation is generally limited to allegations contained in the complaint. *Goines v. Calley Cmty. Servs. Bd.*, 822 F.3d 159, 166-67 (4th Cir. 2016). However, courts may also consider documents explicitly incorporated into the complaint by reference. *Id.* at 166 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). In addition, a court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* (citing *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted). Considering such documents does not convert a motion to dismiss to one for summary

judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## ANALYSIS

In this action, Plaintiff CFG seeks to enforce the terms of a purported oral indemnification agreement against Defendants AJZ Capital and Zuccari. Defendants move to dismiss the Complaint, characterizing it as an "incoherent" set of allegations which fail to state a claim. To the extent that the general nature of the claims may be deciphered, they argue that the February 2016 contract modification bars any claims against Zuccari premised on an earlier, oral agreement. They further argue that the statute of frauds bars the entire Complaint because all of its claims are premised on an oral guaranty agreement. Finally, Defendants contend that all counts are barred by the statute of limitations.[2]

The Defendants' characterization of Plaintiff's pleading is warranted. The Complaint contains a number of confounding inconsistencies and glosses over important details. Many of these errors are the product of CFG's disregard for the corporate form, which provided grounds for dismissal of all but one of the claims in *Dwyer, et al. v. Zuccari*, RDB-19-1272 (D. Md.). *See Dwyer v. Zuccari,* RDB-19-1272, 2020 WL 1308282, at *5 (D. Md. Mar. 19, 2020) ("The principal problem affecting the Plaintiffs' claims is their confessed disregard for the separate legal status ordinarily afforded to corporate entities . . . ."). For example, the Complaint first alleges that Fortress Investment Group, LLC "provided a term sheet for a loan [in the amount of $14 million] to Skyline Arkansas Holdings, LLC ("Skyline Arkansas") to be funded by Fortress Credit Co. LLC." (*Id.* ¶ 28.) Later in the Complaint, it emerges that

---

[2] Defendants raise numerous alternative arguments in support of their motion. This Court need not reach those arguments because it finds that dismissal is appropriate on other grounds.

Fortress issued the $14 million loan not to Skyline Arkansas, but to CLMG Skyline SPE I, LLC ("CLMG Skyline"), an entity that is not owned by Schwartz (*See* ECF No. 17 at 4 n.2), which in turn issued a separate loan to "Schwartz's Skyline Arkansas entities," which are not precisely identified in the Complaint.  (*Id.* ¶¶ 45, 46.)  Furthermore, the Complaint variously refers to the central agreement or series of agreements forming the basis of this suit as a "guaranty," "contribution," or "indemnification."  (ECF No. 1 ¶¶ 1, 4, 5, 11.)  These types of inconsistencies obfuscate the precise nature of Plaintiff's claims, as discussed in greater detail below.  Dismissal is warranted on this basis alone.  *See Arkansas Nursing Home Acquisition, LLC v. CFG Cmty. Bank,* RDB-19-3632, 2020 WL 2542165, at *6 (D. Md. May 19, 2020) ("[W]hen a complaint contains inconsistent and self-contradictory statements, it fails to state a claim." (citing *Nicholson v. Fitzgerald Auto Mall*, RDB-13-3711, 2014 WL 2124654, at *4 (D. Md. May 20, 2014))).

Those problems aside, the Complaint warrants dismissal for the remaining reasons advanced by the Defendants:  the February 2016 modification bars any claims against Zuccari based on an earlier, oral agreement; the statute of frauds prevents CFG from enforcing the unwritten guaranty agreement at the heart of this lawsuit, and all claims are barred under a three-year statute of limitations.

## I. The Alleged Modification Agreement Bars the Breach of Contract Claim Against Zuccari in Count I.

In Count I, CFG alleges that Zuccari breached a purported agreement to contribute 49% of the payments made or losses incurred by Dwyer and CFG in connection with CLMG Skyline's obligations to Fortress.  (ECF No. 1 ¶¶ 65, 67.)  CFG seeks dismissal of this claim, arguing that the February 2016 modification agreement, pursuant to which AJZ Capital would

provide indemnification,[3] vitiated Zuccari's earlier obligation to make a 49% contribution. (ECF No. 10-1 at 17-18.) CFG counters that the modification merely added AJZ Capital as a source of indemnification, but did not alleviate Zuccari's obligation. (ECF No. 17 at 17-19.)

Under Maryland law, the modification of a contract results in a new contract.[4] *Berringer v. Steele*, 133 Md. App. 442, 758 A.2d 574, 608 (2000). *Dep't of Pub. Safety & Corr. Servs. v. ARA Health Servs., Inc.*, 107 Md. App. 445, 668 A.2d 960, 967 (Md. Ct. Spec. App. 1995), *aff'd*, 344 Md. 85, 685 A.2d 435 (1996) ("[A] modification is 'an abandonment of the original contract and a creation of a new contract.'" (citation omitted)). The extent of the modification "depends on the nature of the change and the intention of the parties." 5A Maryland Law Encyclopedia, Contracts § 123.

The Complaint in this case alleges an initial oral agreement and a subsequent modification. Initially, the parties allegedly agreed that "Zuccari would . . . personally indemnify and contribute to Dwyer and CFG forty-nine percent (49%) of any losses incurred or payments made by CFG, Dwyer, or their affiliated entities or personnel for payment on the Fortress loan arising from Schwartz's or Skyline's default on their obligations." (ECF No. 1 ¶ 34.) Next, in February 2016, the parties discussed a "proposed modification" whereby AJZ Capital "would also be involved," or would "be added as an indemnitor." (*Id.* ¶ 40.) Finally, on February 22, 2016, the parties reached an agreement that "AJZ Capital would indemnify

---

[3] This Court uses the term "indemnification" in this Section, as that is the label provided in the relevant sections of the Complaint. As discussed *infra*, Section II, the label "guaranty" is more appropriate.

[4] When a federal district court exercises its diversity jurisdiction, as in this case, it applies the choice of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *State Auto. Mut. Ins. Co. v. Lennox*, 422 F. Supp. 3d 948, 961 (D. Md. 2019). For contract claims, Maryland follows the rule of *lex loci contractus* and applies the law of the state where the contract was formed. *Cunningham v. Feinberg*, 441 Md. 310, 107 A.3d 1194, 1204 (2015). In this case, the parties entered into the alleged guaranty agreement in Maryland. (ECF No.1 ¶¶ 10, 23.) Accordingly, Maryland contract law applies.

CFG and Dwyer for losses sustained as a result of a default by Schwartz and Skyline." (*Id.* ¶ 43.) Pursuant to that final modification, Zuccari "agreed to fund those losses if AJZ Capital" fell below certain liquidity requirements. (*Id.*)

In summary, the parties first agreed that Zuccari would provide indemnification, but a subsequent modification resulted in the agreement that AJZ Capital, not Zuccari, would act as an indemnitor. That subsequent modification created a new contract that supplanted Zuccari with AJZ Capital as indemnitor, and in turn required Zuccari to guaranty AJZ Capital's obligation. Although the Complaint refers to "proposed modifications" whereby AJZ Capital would be an *additional* source of indemnification, the Complaint ultimately alleges that AJZ Capital would provide indemnity. (ECF No. 1 ¶ 43.) That final summation of the modification controls, not the description of the parties' proposals. (*Compare* ECF No. 1 ¶ 40 (describing the parties' negotiations) *with* ECF No. 1 ¶ 43 (summarizing the terms of the agreement)). Accordingly, the breach of contract claim in Count I arising from Zuccari's alleged failure to make indemnification payments is DISMISSED WITH PREJUDICE.

**II. The Statute of Frauds Bars All Claims.**

The Complaint focuses on an oral promise, or series of oral promises, by Defendants to provide funding in the event that Schwartz or Skyline entered default. The Complaint variously describes the promise as a "guaranty," "contribution," or "indemnification." (ECF No. 1 ¶¶ 1, 4, 5, 11.) Defendants characterize this promise as a guaranty, which is subject to the statute of frauds and accordingly cannot be enforced without a signed writing. (ECF No. 10-1 at 18-19.) Plaintiff contends that the promise is not a guaranty, but rather an "agreement

13

. . . to contribute[5] and indemnify," despite the allegations of the Complaint which suggest otherwise. (*Compare* ECF No. 17 at 19-22 *with* ECF No. 1 ¶ 11 ("Zuccari and AJZ Capital . . . made a guaranty of CFG . . . to guarantee lending.")). Alternatively, Plaintiff argues that the email exchanges referenced in the Complaint satisfy the statute of frauds requirements. (ECF No. 17 at 22-24.)

### A. The Statute of Frauds Applies to the Alleged Guaranty.

The Maryland statute of frauds provides that:

> Unless a contract or agreement upon which an action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or another person lawfully authorized by that party, an action may not be brought: (1) To charge a defendant on any special promise to answer for the debt, default, or miscarriage of another person."

Md. Code Ann., Cts. & Jud. Proc. § 5-901(1). As this Court has previously noted, a guaranty "is a contract under which the guarantor promises to perform the obligations of the principal if the principal fails to perform." *CapitalSource Fin., LLC v. Delco Oil, Inc.*, 608 F. Supp. 2d 655, 662 (D. Md. 2009) (citing *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1309-10 (Md. 1985) (citation omitted)). An indemnification agreement, on the other hand, "is an agreement to reimburse one who has been held liable for the amount of his loss." *Strong v. Prince George's Cty.*, 77 Md. App. 177, 549 A.2d 1142, 1144 (Md. Ct. Spec. App. 1988). A guaranty agreement falls within the statute of frauds, but indemnity falls outside of it. *See Rosenbloom v. Feiler*, 290 Md. 598, 431 A.2d 102, 106 (1981) (reciting the "majority or Corbin rule" that an oral promise of indemnity to a guarantor falls outside of the statute of frauds).

---

[5] A "contribution" agreement requires a "'common liability' or burden." *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 674 A.2d 106, 137 (Md. Ct. Spec. App. 1996). The Complaint does not allege the existence of a common liability or burden, and accordingly the agreement forming the basis of this controversy cannot be considered a "contribution" agreement.

The allegations of the Complaint indicate that the parties' agreement was in the nature of a guaranty, not an indemnity, because the agreement required the guarantor to "perform the obligations of the principal" at the moment of the principal's failure to perform. *CapitalSource*, 608 F. Supp. 2d at 662. Unlike an indemnification agreement, which requires reimbursement to "one who has been held liable," AJZ Capital's performance was triggered at the moment of default, regardless of whether a liability determination had been made. *Strong*, 549 A.2d at 1144. The Complaint alleges that "AJZ Capital would indemnify CFG and Dwyer for losses sustained *as a result of a default* by Schwartz and Skyline, and Zuccari personally agreed to fund those losses if AJZ Capital" was underfunded. (ECF No. 1 ¶ 43) (emphasis added). The effect of this agreement was that AJZ Capital was required to perform should the principals (Schwartz and Skyline) fail to do so. That aspect of the agreement—that its obligations triggered as a result of another's default, and that its very purpose was to satisfy another's debts—renders it a guaranty, not an indemnification. Although the alleged agreement shares some similarities with an indemnification, insofar as it requires reimbursement for losses, AJZ Capital's promise to "to answer for the debt, default, or miscarriage of another person" renders its agreement a guaranty within the ambit of the statute of frauds. Md. Code Ann., Cts. & Jud. Proc. § 5-901(1).

### B. The Emails Cited in the Complaint Do Not Satisfy the Statute of Frauds.

Having determined that the statute of frauds applies, this Court considers whether the emails described in the Complaint may satisfy its requirements. The statute of frauds requires

> (1) a writing (formal or informal); (2) signed by the party to be charged or by his agent; (3) naming each party to the contract with sufficient definiteness to identify him or his agent; (4) describing the land or other property to which the

contract relates; (5) setting forth the terms and conditions of all the promises constituting the contract made between the parties.

*Royal Inv. Grp., LLC v. Wang*, 183 Md. App. 406, 961 A.2d 665, 681-82 (2008) (citating omitted). Email exchanges may satisfy the statute of frauds so long as they sufficiently detail the contract's terms. *MEMC Electronic Materials, Inc. v. BP Solar Intern., Inc.*, 196 Md. App. 318, 9 A.3d 508 (Md. Ct. Spec. App. 2010).

As the Court of Special Appeals of Maryland recently held in *Still Point Wellness Centers, LLC v. Columbia Ass'n, Inc.*, No. 1433, 2019 WL 1949620 (Md. Ct. Spec. App. Apr. 30, 2019), emails which only memorialize contract negotiations do not satisfy the statute of frauds. In that case, The Still Point Wellness Centers, LLC ("Still Point") alleged that it had entered into a partnership agreement with Columbia Association, Inc. ("Columbia"). *Id.* at *2. In an attempt to satisfy the statue of frauds, Still Point presented a series of emails exchanged between the parties. *Id.* at *9. The Court rejected Still Point's contention. A review of the emails, the Court concluded, "demonstrated that no agreement had yet been reached by the parties, but that the parties were working toward an agreement." *Id.* Critically, the Court found that the emails contained several *proposed* terms, but never reached a final agreement. *Id.*

In reaching its decision, the *Still Point Wellness* Court distinguished its prior ruling in *MEMC Electronic Materials, Inc. v. BP Solar Intern., Inc.*, 196 Md. App. 318, 9 A.3d 508 (Md. Ct. Spec. App. 2010), a case upon which CFG relies. As the *Still Point Wellness* Court explained, *MEMC* involved a "longstanding relationship" between BP Solar and MEMC pursuant to which BP Solar purchased silicon powder from MEMC for use in its production of solar panels. *MEMC*, 9 A.3d at 513-14. The parties' business dealings began with a signed writing

16

in 1997. *Id.* at 514. Subsequent sales were arranged through email. *Id.* at 514-15. The Court concluded that these email exchanges satisfied the statute of frauds because, among other reasons, the emails specified the exact quantity of silicon powder to be purchased. *Id.* at 522. The *Still Point Wellness* Court explicitly observed that *MEMC* was distinguishable because it involved a contract produced from a long-standing relationship between two parties, originating in a signed writing, and supplemented with "very specific emails" identifying the precise quantity of silicon powder for purchase. *Still Point Wellness*, 2019 WL 1949620, at *9.

As in *Still Point Wellness*, the emails in this case manifest contract negotiations, not the firm, written agreements at issue in *MEMC*. In the Complaint, CFG alleges that "Zuccari emailed Dwyer . . . to confirm his promise . . . to provide for a 'claw back' of funds from Zuccari in the event of a default by Schwartz." (ECF No. 1 ¶ 35.) This email, which is not attached to the Complaint, is exceedingly vague and does not appear to memorialize any of the contract terms sought to be enforced in this action. The remaining emails referenced in the Complaint, which are likewise not attached, clearly describe proposed contract terms of the kind described in *Still Point Wellness*. (*See* ECF No. 1 ¶ 40 ("[T]he two agents engaged in a correspondence about a proposed modification . . . ."); *id.* ¶ 41 ("If we trip the covenant requirement, Alan *should be* obligated to infuse capital . . . .") (emphasis added)). Unlike in *MEMC*, the parties in this case were not merely extending the term of a sales contract through emailed purchase orders. Rather, they were allegedly engaged in evolving contract negotiations concerning a new asset sale involving several third parties. The emails, as described in the Complaint, do not memorialize the specific terms of a finalized agreement. Accordingly, CFG's claims are barred by the statute of frauds.

**III.     All Claims are Barred by the Statute of Limitations.**

Alternatively, if the agreement underlying this action is better construed as an indemnification agreement, Defendants argue that all of Plaintiff's claims are barred by the applicable three-year statute of limitations.  (ECF No. 10-1 at 22-23.)  To support this argument, Defendants attach an Unsigned Guaranty Contribution Agreement, purportedly referenced in paragraph 36 of the Complaint, which specifies that Defendants were required to satisfy their obligations upon an "Event of Default." (ECF No. 10-2 § 3(d).)  Defendants argue that, because the alleged "Event of Default" occurred in October 2016 when Schwartz and Skyline defaulted on the Fortress loan, the instant Complaint should have been filed by October 2019.  CFG counters that the attached Unsigned Guaranty Contribution Agreement "cannot be considered" because it is not integral to the Complaint.  (ECF No. 17 at 15, 26-27.)  The Complaint is timely, CFG argues, because its claim accrued only when CFG started making payments to Fortress in October 2018.  (ECF No. 1 ¶ 63; ECF No. 17 at 27.)

As a preliminary matter, this Court takes judicial notice of the Unsigned Guaranty Contribution Agreement.  Documents which are "integral to the complaint and authentic" may be considered upon a motion to dismiss.  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) (quoting *Sec'y of State for Defense v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).  The authenticity of the document is not disputed.  The Court finds that it is integral to the Complaint.  The Complaint references "a draft Guaranty Contribution Agreement" of February 2, 2016 which allegedly required Zuccari to indemnify and defend CFG and Dwyer. (ECF No. 1 ¶ 36.)  Defendants represent that the Unsigned Guaranty Contribution Agreement attached to the Defendants' Motion to Dismiss (ECF No. 10-2) is

the "latest iteration" of that agreement, a fact which Plaintiff does not dispute. Accordingly, the Court will consider the Unsigned Guaranty Contribution Agreement for the limited purpose of determining when Plaintiff's breach of contract claim accrued.

A three-year statute of limitations applies to Maryland breach of contract claims. Md. Code Ann., Cts. & Jud. Proc. § 5-101. Ordinarily, a cause of action arising from an indemnification agreement does not accrue until damages result. *See Luppino v. Vigilant Ins. Co.*, 110 Md. App. 372, 677 A.2d 617 (1996), *aff'd*, 352 Md. 481, 723 A.2d 14 (1999) (holding that cause of action arising from insurer's breach of duty to indemnify did not accrue until a judgment was rendered against the insured.). However, where an indemnification agreement contains an "express promise to pay a debt," a cause of action accrues as soon as default occurs, even if the plaintiff has not yet suffered damages. *Levin v. Friedman*, 271 Md. 438, 317 A.2d 831, 834-35 (1974) (collecting authorities).

In this case, the Complaint makes clear that the purpose of the contract was to satisfy Schwartz's and Skyline's debts in the event of a default. Accordingly, the Plaintiff's cause of action accrued as soon as a default on the Fortress loan occurred. Furthermore, the Unsigned Guaranty Contribution Agreement specifically required AJZ Capital to provide indemnification upon an "Event of Default," at which time the Plaintiff's cause of action would accrue. The Complaint alleges "technical defaults existed under the Fortress loan" in October of 2016. (ECF No. 1 ¶ 56.) Plaintiff's claim accrued at that instance of default, and the statute of limitations period expired three years later, in October of 2019. This case was not filed until June 1, 2020. Accordingly, all of Plaintiff's claims are barred by the statute of

19

limitations. All of Plaintiff's claims are DISMISSED WITH PREJUDICE as both barred by the statute of frauds and the statute of limitations.

## CONCLUSION

For the reasons stated above, Defendants Alan J. Zuccari and AJZ Capital, LLC's Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint (ECF No. 10) is GRANTED. This case is DISMISSED WITH PREJUDICE.

A separate Order follows.


Dated:		October 1, 2020

                                                          \_\_\_\_\_/s/_____
                                                          Richard D. Bennett
                                                          United States District Judge